UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CARLOS M. VARGAS,                                          :

                        Plaintiff,             :          09 Civ. 6606 (BSJ)(DF)

   -against-                                             :          **REPORT AND**
                                          **RECOMMENDATION**

MICHAEL J. ASTRUE,                                         :
Commissioner of Social Security,

                                   :

                       Defendant.
-------------------------------------------------------------X

**TO THE HONORABLE BARBARA S. JONES, U.S.D.J.:**

## INTRODUCTION

Plaintiff Carlos M. Vargas, Jr. ("Plaintiff") seeks review of the final decision of

Administrative Law Judge Mark Hecht (the "ALJ") in favor of Defendant, the Commissioner of

Social Security ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security

Income ("SSI") benefits under the Social Security Act (the "Act") on the ground that Plaintiff's

impairments did not constitute a disability for the purposes of the Act.  Defendant has moved

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings

affirming the decision of the ALJ (Dkt. 10), and Plaintiff has cross-moved for judgment on the

pleadings reversing the ALJ's decision (Dkt. 12).

For the reasons set forth below, I respectfully recommend granting Defendant's motion

for judgment on the pleadings and denying Plaintiff's cross-motion.

# BACKGROUND[1]

## A.    Plaintiff's Personal and Employment History

Plaintiff was born on May 18, 1987 and was 18 years old on the date he alleges his disability began.[2]  (R. at 11.)  He was in a special education program until the ninth grade, when he was forced to leave school because of learning difficulties and bad behavior.  (*Id*. at 28, 77.) Plaintiff has always lived with his grandmother.  (*Id.* at 27.)  He has two children, both of whom reside with their mother.  (*Id.*)

Prior to leaving school, Plaintiff had been assessed for his learning disabilities at least twice.  In a May 30, 2001 psychological evaluation, School Psychologist Zari Brasero reported that Plaintiff was "resistive and uncooperative" and refused to complete the tasks requested by the examiner.  (*Id.* at 119.)  The report also indicates that Plaintiff appeared to be "inattentive and disruptive and confrontational with adults" and was functioning below grade level because of "excessive absences and frequent class cutting."  (*Id.* at 120.)  At the time Plaintiff left school, his grade point average was 51.76.  (*Id.* at 77.)

A second evaluation completed a week later on June 7, 2001 reports a change in Plaintiff's attitude but similar results in educational capacity.  (*Id.* at 122.)  In that evaluation, Educational Evaluator Doris Fuentes described Plaintiff as "a polite, compliant young man" and wrote that he was "attentive during the entire testing session."  Ms. Fuentes reported that he

---

[1] The background facts set forth herein are taken from the administrative record (referred to herein as "R."), which includes, *inter alia,* Plaintiff's medical records and the transcript of the November 18, 2008 hearing held before the ALJ, at which Plaintiff testified.

[2] Plaintiff initially filed his claim on September 4, 2007, alleging disability beginning on June 15, 2005.

"worked diligently to complete all of the tasks that were presented." (*Id.*) The report concludes that, although Plaintiff had been in the ninth grade, his reading skills were at the lower fifth grade level, his writing skills at the lower second grade level, and his math skills at the lower sixth grade level. (*Id.* at 125.)

At the time of the hearing, Plaintiff had worked at four separate jobs since leaving school. (*Id.* at 28-31.) Most recently, he had worked in construction, installing sheet rock. (*Id.* at 29.) In his hearing before the ALJ, he testified that, after working for four months, he left that job on his own accord in January 2007 because of pain in his hands and legs from bone tumors. (*Id.* at 29, 31.) Plaintiff testified that, since high school, he had also worked in a factory "putting stuff in [a] machine (*id.* at 30)," he had worked as an "Elderly Aide" in a Senior Citizen Center (*id.* at 30, 141), and he had also done office work. (*Id.* at 30.) He reported difficulty in each of these positions due to either nervousness or an inability to stand because of swelling in his legs. (*Id.*) At the time of his hearing before the ALJ, Plaintiff was 21 years old and had not worked in a year and a half. (*Id.* at 31.)

### B.   Plaintiff's Medical History

### 1.   Medical Records

Plaintiff's initial disability report indicates that Plaintiff claimed that multiple osteochondromatosis,[3] asthma, and a learning disability limited his ability to work. (*Id.* at 140.) Plaintiff's medical records show that he was treated in the emergency room for his asthma on

---

[3] This condition is characterized by a presence of multiple benign tumors "consisting of projecting adult bone capped by cartilage projecting from the lateral contours of endocondral bones." (*See* Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, dated May 6, 2010 ("Def. Mem.") (Dkt. 11) at 4 n.2. (citing *Dorland's Illustrated Medical Dictionary* 1333 (30th ed. 2003)).) "Endocondral bones" are bones, like the long bones of the arms and legs, that develop in, and replace, cartilage. *See* http://www.medterms.com/script/main/art.asp?articlekey=10372.

May 22, 2007.  (*Id.* at 172.)  During that visit, the attending registered nurse reported that

Plaintiff was "complaining of shortness of breath" and exhibiting "lungs with wheezing" and

"mild respiratory distress."  (*Id.*)  The attending doctor ordered an "asthma protocol" and

continued monitoring.  (*Id.*)  For his asthmatic condition, Plaintiff has been proscribed albuterol,

asmacort, and prenisone.  (*Id.* at 144.)

Plaintiff's medical records also contain a handwritten letter from Dr. Jyothi Kudakandira

of Martin Luther King Jr. Health Center, confirming that Plaintiff had multiple

osteochondromatosis.  (*Id.* at 185.)  Dr. Kudakandira's note explains that, as a result of "pain in

the lower limbs due to the bony tumor (swelling)," Plaintiff required a cane "most of the time he

walk[ed]."  (R. at 185.)

### 2.   Consultative Examinations

#### a.   Dr. Barbara Akresh

On October 24, 2007, Dr. Barbara Akresh, an SSA consultative physician, conducted an

examination of Plaintiff.  (*Id.* at 176.)  Dr. Akresh noted that Plaintiff had pain in his right ankle

and both knees that prevented him from walking more than 10 blocks or two flights of steps

without experiencing pain and swelling.  (*Id.*)  Plaintiff informed Dr. Akresh that he had been

told about a tumor on his left leg "which should have some surgery."  (*Id.*)  He had not consulted

with his orthopedist, however, since 2004 – three years earlier.  (*Id.*)  In examining Plaintiff's

extremities, Dr. Akresh reported "several abnormalities," including bony prominences on

Plaintiff's arms and legs, and deformities on his hands and feet.  (*Id.* at 179.)  Although

Plaintiff's deformities included shortened fingers on both hands, his hand and finger dexterity was intact and his "grip strength" was reported as "5/5 bilaterally."[4]  (*Id.*)

Dr. Akresh observed that Plaintiff had a "normal gait," yet could not walk on his toes or heels.  (*Id.* at 178.)  Plaintiff used a cane that his doctor had given him four years before the exam, but Dr. Akresh noted that his "[g]ait with and without [the] device [was] [the] same." (*Id.*)  Dr. Akresh opined that the "cane [was] not medically necessary at least for short distances," and noted that Plaintiff needed no help in rising from his chair, nor in changing for the exam.  (*Id.*)

During the examination, Plaintiff reported that, since childhood, he had a history of asthma, which was "exacerbated by exposure to smoke, pollens, change of season, or if he had an upper respiratory infection."  (*Id.* at 176.)  Plaintiff had never been hospitalized for this condition.  (*Id.*)  He had, however, been hospitalized for a "left thoracotomy and rib resection" at the age of two, as well as for a fractured left leg in 2002.  (*Id.*)  At some point Plaintiff also suffered a fractured right forearm, but he was not hospitalized for that injury.  (*Id.*) Dr. Akresh's report indicates that Plaintiff smoked cigarettes and marijuana.  (*Id.* at 177.) Plaintiff reported that, since 2003, he had smoked marijuana three times a week and had smoked up to a pack of cigarettes per day.  (*Id.*)  Plaintiff told Dr. Akresh that he had been drinking since 2003, and, at the time of the examination, he reported drinking a quart of beer or liquor twice a week.  (*Id.*)

---

[4] The Medical Research Council ("MRC") recommends the use of a 0-5 scale for measuring muscle strength; a grade of 5/5 means that the muscle contracts normally against full resistance.  *See* http://www.medicalcriteria.com/site/index.php?option=com.content&view= article&id=238%3Aneuromrc&catid=64%3Aneurology&Itemid=80&lang=en.

Dr. Akresh reported that, in Plaintiff's daily life, Plaintiff had "moderate limitations in his ability to lift and carry heavy objects or stand for any length of time." (*Id.* at 180.) According to Dr. Akresh, Plaintiff was able to help his grandmother shop and did "a little cleaning once a week." (*Id.* at 176.)  When shopping, however, Plaintiff did not carry groceries. (*Id.*)  Plaintiff reported that he was able to shower and dress himself, and that he went out and socialized with friends.  (*Id.*)  Dr. Akresh advised Plaintiff to follow up with his physicians because of his asthmatic condition and limitations in mobility.  (*Id.* at 180.)

**b.      Dr. Edward Hoffman**

Psychologist Dr. Edward Hoffman examined Plaintiff as part of an SSA consultative intelligence evaluation on December 14, 2007.  (*Id.* at 186.)  In assessing Plaintiff's behavior, Dr. Hoffman described plaintiff as having a pleasant demeanor and maintaining good eye contact.  (*Id.* at 187.)  Dr. Hoffman indicated, though, that Plaintiff was unable to follow test directions well and demonstrated below average attention and concentration.  (*Id.*)  In the course of the examination, Dr. Hoffman administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), a standardized intelligence test.  (*Id.*)  On this assessment, Plaintiff scored a 70 on the "Verbal Scale IQ," a 63 on the "Performance Scale IQ," and a 64 on the "Full Scale IQ."  (*Id.*)  Dr. Hoffman noted that scores of this nature in the verbal and performance areas indicated, respectively, that Plaintiff was "borderline mentally deficient" and had "deficient ranges of intelligence."  (*Id.*)

Dr. Hoffman reported that, in Plaintiff's daily activities, Plaintiff cooked, did laundry, shopped, and took public transportation by himself.  (*Id.* at 187-88.)  According to Dr. Hoffman's report, Plaintiff was also able to shower independently, select his clothes in the

morning, and use the telephone (*id.* at 188), although he was not able to manage his funds independently (*id.* at 189).  Dr. Hoffman opined that, in totality, these characteristics were evidence of "adequate adaptive functioning and socialization skills."  (*Id.* at 188.)

Dr. Hoffman's report appears to be somewhat inconsistent with respect to Plaintiff's ability to follow directions and maintain attention (*compare* "Behavioral Observation," noting that "[Plaintiff] was not able to follow test directions well.  His attention and concentration were below average" (*id.* at 187), *with* "Medical Source Statement," noting that "[v]ocationally, [Plaintiff] appears to be able to understand and follow simple and complex directions . . . He can maintain attention and concentration for rote tasks" (*id.* at 188)), although it is unclear whether the different sections of the report that touch on this subject relate to different evaluative tests or call for different criteria to be applied.

The "Medical Source Statement" portion of Dr. Hoffman's report indicates abilities not mentioned in other parts of the report.  For example, Dr. Hoffman reported there that Plaintiff could "perform simple tasks independently" and that he could "regularly attend to a routine, and maintain a schedule."  (*Id.*)  Additionally, Dr. Hoffman reported that Plaintiff could "learn new rote tasks," as well as "relate to other people appropriately" and "make simple decisions."  (*Id.*)  In the course of the examination, Plaintiff told Dr. Hoffman that he smoked marijuana every day and used cocaine twice a month, but that he did not have a history of alcoholism.  (*Id.* at 186.)  Overall, Dr. Hoffman diagnosed Plaintiff with "cannabis abuse with learning problems," mild mental retardation, asthma, and bone disease.  (*Id.* at 188.)  Dr. Hoffman recommended that Plaintiff enter a substance abuse program and "be encouraged to study for his GED and that his grandmother be involved with him in family counseling."  (*Id.*)  Dr. Hoffman stated that, with

"continued intervention and support," Plaintiff would find "symptom relief and maximize his abilities." (*Id.*)

### c.    Dr. E. Kamin

On January 4, 2008, Plaintiff was given a Psychiatric Review by SSA psychologist Dr. E. Kamin. (*Id.* at 190-207.) In evaluating the Section 12.05 criteria for mental retardation,[5] Dr. Kamin diagnosed Plaintiff as exhibiting mild mental retardation (*id.* at 194), although Dr. Kamin's report appears to evince conflicting opinions as to whether Plaintiff satisfied the criteria of that section. At the top of page five of the "Psychiatric Review Technique," Dr. Kamin checked boxes listing the requirements for Section 12.05, suggesting that Plaintiff met the requirements under this section. Dr. Kamin, however, also checked the box indicating "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." (*Id.*)

In the "Summary Conclusions" portion of Dr. Kamin's "Mental Residual Functional Capacity Assessment," Dr. Kamin indicated that Plaintiff was "Not Significantly Limited" in 17 of the categories listed, and only "Moderately Limited" in three of the categories. (*Id.* at 204-05.) In the report's "Remarks" section, Dr. Kamin also opined that, although Plaintiff had difficulty following the test directions, he was "able to maintain attention/concentration" and could understand simple instructions to complete tasks. (*Id.* at 205-06.) Dr. Kamin further wrote that Plaintiff showed "adequate adaptive function and socialization skills" and that his

--------

[5] Section 12.05 in the appendix of 20 C.F.R. Pt. 404, subpart P, provides a diagnostic description and four sets of criteria for mental retardation. If a claimant's impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, an impairment will meet the listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1; *see also infra*, at 19-20.

8

impairments were "severe but do not meet or equal [the] listing level."  (*Id.* at 206.)  Ultimately,

Dr. Kamin found that Plaintiff was able to "do entry level [substantial gainful activity]."  (*Id.*)

    **C.**    **Procedural History**

        **1.**    **Plaintiff's Application for Benefits**

Plaintiff filed an application for Supplemental Security Income on September 4, 2007

(*id.* at 60), in which he claimed that the onset date of his disability was June 15, 2005 (*id.*).

Based on Dr. Kamin's evaluation, as described above, the Social Security Administration

("SSA") denied Plaintiff's application on January 16, 2008.  (*See id*. at 40-43.)  The SSA

determined that Plaintiff's condition was not severe enough to keep him from working, and that

the medical evidence and other relevant information demonstrated that Plaintiff could perform

light work at a job involving simple tasks.  (*Id.* at 43.)  Subsequently, Plaintiff requested a

hearing on the matter before an Administrative Law Judge.  (*Id*. at 44-46.)

        **2.**    **The Administrative Hearing**

On November 18, 2008, Plaintiff appeared *pro se* before the ALJ.  (*Id*. at 24.)  After

confirming that Plaintiff understood the hearing and review process (*id*. at 24-26), the ALJ

questioned him about his level of independence.  (*Id*. at 27.)  Plaintiff testified that he had

always lived with his grandmother and had never lived alone.  (*Id.*)  He also indicated that he

was unmarried, but had two small children who lived with their mother.  Plaintiff stated that he

was able to use public transportation by himself, but did not drive.  (*Id*. at 27-28.)

The ALJ then questioned Plaintiff about his education and employment background.  (*Id.*

at 28.)  Plaintiff testified that he had completed the ninth grade, but had then been "kicked out"

of school for "behavior" when he was about 17 years old.  (*Id.*)  During his schooling, Plaintiff

had been placed in special education classes.  (*Id.*)  At the time of the hearing, Plaintiff had not

attended school in four years.  (*Id.*)  During that period, he had worked at the four jobs noted

above, but, at the time of his hearing, he had not worked for a year and a half.  (*Id*. at 28-31.)

The ALJ next asked Plaintiff about his drug use.  (*Id*. at 31-32.)  Plaintiff testified that he

used marijuana four or five times a month for the pain he experienced.  (*Id.* at 32.)  He also

admitted to using cocaine.  (*Id.*)  When asked how he payed for the drugs, Plaintiff said that his

friends would give drugs to him.  (*Id.*)

The ALJ also questioned Plaintiff about his medical history.  (*Id*. at 33.)  Plaintiff stated

that he was born with a bone condition that caused him to have pain in his extremities.  (*Id.*)

When asked where, specifically, he experienced the pain, he stated, "[i]t's in my ankles, my

knees, all the long bones, my arms, my hands."  (*Id.*)  Plaintiff testified that he was prescribed

Tylenol for his pain, but it did not really help him.  (*Id.*)  The ALJ then questioned Plaintiff

regarding his history of asthma.  (*Id.* at 34.)  Plaintiff stated that he was affected by it when the

weather was changing and that he had last received asthma treatment about a year previously.

(*Id.*)

Finally, the ALJ asked about Plaintiff's physical limitations.  (*Id.*)  Plaintiff testified that,

while he did not have difficulty sitting in one place, he did have trouble standing for more than

an hour.  (*Id*. at 34-35.)  Plaintiff stated that he used a cane "once in a while," when his legs

swelled up, but that he had not used one on the day of the hearing because he had taken the train.

(*Id.* at 35.)  Plaintiff estimated that he could lift or carry about 15 pounds.  (*Id.*)  He also testified

that he was able to go grocery shopping by himself and that he played video games to occupy

himself.  (*Id.*)  When asked by the ALJ whether he could work in a position similar to those he

had held before, Plaintiff said he could not because the standing would cause his legs to swell.

(*Id.* at 36.)  When asked, however, whether he could work in a job sitting down that would not

require him to lift more than 10 pounds, Plaintiff responded, "Yeah.  I could find, get a job like

that."  (*Id*. at 36-37.)

At the end of the hearing, Plaintiff mentioned that doctors had "found a bone that's up

there in [his] head," which was causing him headaches.  (*Id.* at 37.)  Although these headaches

were not severe, Plaintiff testified that he experienced them "most of the time."  (*Id.*)  There does

not appear to be any additional information in the record concerning this particular condition.

### 3.      The ALJ's Decision

By Notice of Decision dated January 23, 2009, the ALJ affirmed the Social Security

Administration's initial denial of benefits, finding that Plaintiff was not disabled within the

meaning of the Act and pertinent regulations.  (*Id*. at 8-21.)  In particular, the ALJ found that,

while Plaintiff might not have been able to perform any of his past relevant work, he nonetheless

retained the residual functional capacity to perform sedentary work, as defined in 20 C.F.R.

416.967(a).  (*Id*. at 13-14.)

In his written decision, the ALJ found that Plaintiff's "medically determinable mental

impairment of borderline mental deficiency and mentally deficient range of intelligence does not

cause more than minimal limitation in the claimant's ability to perform basic mental work

activities and is therefore nonsevere."  (*Id*. at 13.)  The ALJ supported this finding by noting that

Plaintiff had demonstrated no limitations in daily living, social functioning, concentration, or

decompensation.  (*Id.*)  Specifically, the ALJ pointed to Plaintiff's ability to carry out basic

activities such as cooking, doing laundry, shopping, using public transportation independently, and caring for his personal hygiene.  (*Id.*)

Moreover, the ALJ accepted the conclusions of the SSA examiners, detailed above, concerning the extent of Plaintiff's physical limitations.  (*Id.* at 20.)  While the ALJ found that Plaintiff exhibited symptoms of physical challenges, the ALJ further found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the above residual functional capacity assessment."  (*Id.* at 15.)  Based on the opinions of the examiners, the ALJ determined that Plaintiff had retained the capacity to perform the demands of the full range of sedentary work. (*Id.* at 21.)  Ultimately, based on Plaintiff's residual functional capacity, as well as his age, education, and work experience, the ALJ concluded that the applicable Medical-Vocational Rule 201.24 directed the finding that Plaintiff was not disabled.  (*Id.*)

### D.      The Motions Before This Court

Currently before the Court are the parties' cross-motions for judgment on the pleadings. In his moving papers, Defendant argues that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence and that the determination must therefore be upheld.  (*See generally* Def. Mem.; Reply Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings and in Further Support of the Commissioner's Motion for Judgment on the Pleadings, dated Jul. 21, 2010 ("Def. Reply Mem.") (Dkt. 15).) Plaintiff, for his part, argues that the record lacks substantial evidence to support the ALJ's determination.  (*See generally* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Support of his Motion for Judgment on the

Pleadings, dated Jun. 4, 2010 ("Pl. Mem.") (Dkt. 13); Plaintiff's Reply Memorandum of Law in

Support of His Motion for Judgment on the Pleadings, dated Aug. 16, 2010 ("Pl. Reply Mem.")

(Dkt. 16).)   In particular, Plaintiff contends that (1) the ALJ failed to make a proper assessment

of the listing requirements for mental retardation under 20 C.F.R. Pt. 404, Subpt. P, App. 1,

12.05(C) (Pl. Mem., at 10-14; Pl. Reply Mem., at 1-5); (2) the ALJ failed to develop the record

(Pl. Mem., at 15-18; Pl. Reply Mem., at 6-9); and (3) the Commissioner failed to meet his

burden of proof that Plaintiff was capable of performing other work in the national economy,

and, in connection with determining whether the Commissioner had met this burden, the ALJ did

not evaluate whether Plaintiff's severe nonexertional impairments significantly diminished his

ability to work.  (Pl. Mem., at 18-21; Pl. Reply Mem., at 11-13.)

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Standard of Review

Judicial review of a decision of the Commissioner is limited.  The Commissioner's

decision is final, provided that the correct legal standards are applied and findings of fact are

supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d

Cir. 2000).  "'Where an error of law has been made that might have affected the disposition of

the case, this [C]ourt cannot fulfill its statutory and constitutional duty to review the decision of

the administrative agency by simply deferring to the factual findings of the ALJ.'"  *Townley v.

Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).  Thus, the Court must first ensure

that the ALJ applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.

1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

The Court must then determine whether the Commissioner's decision is supported by substantial evidence. *See Tejada*, 167 F.3d at 773. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The Court must consider the record as a whole in making this determination, but it is not for this Court to decide *de novo* whether the plaintiff is disabled. *See Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). The Court will uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming an ALJ decision where substantial evidence supported both sides).

### B.     The Five-Step Procedure for Evaluating a Claim of Disability

To be entitled to benefits under the Act, a plaintiff must establish that he or she has a "disability." *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). The term "disability" is defined in the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Balsamo*, 142 F.3d at 79. Moreover,

14

> [a]n individual shall be determined to be under a disability only if
> his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B).

In evaluating a disability claim, the ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. § 404.1520 (2010); *Diaz v. Shalala*, 59 F.3d 307, 311 n.2 (2d Cir. 1995); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If not, the second step requires the ALJ to consider whether the claimant has a "severe" impairment or combination of impairments that significantly limit his or her physical or mental ability to do basic work activities. *Id.* §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). If claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals a listed impairment in Appendix 1 of the regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment meets or equals one of those listed, the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id.* §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d). If the presumption does not apply, then the fourth step requires the ALJ to determine whether the claimant is able to perform his or her "past relevant work." *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the

fifth step requires the ALJ to determine whether the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).

In making a determination by this process, the ALJ must consider four sources of evidence: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

Under the procedure set out in the governing regulations, "[t]he claimant bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment." *Berry*, 675 F.2d at 467 (citation omitted); *see* 20 C.F.R § 404.1520. Once it has been determined that the claimant cannot perform his past relevant employment, the Commissioner then has "the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)); *see also Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984) ("The burden of proving disability is on the claimant. However, once the claimant has established a prima facie case by proving that his impairment prevents his return to his prior employment, it then becomes incumbent upon the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training.") (citation omitted)).

C.      **The ALJ's Obligation To Develop a Complete Record**

Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative duty to develop the administrative record.  *Perez v. Chater*, 77 F.3d

41, 47 (2d Cir. 1996) (citing *Echevarria v. Secretary of Health & Human Services*, 685 F.2d 751,

755 (2d Cir. 1982)).  The Secretary's regulations describe this duty by stating that, "[b]efore we

make a determination that you are not disabled, we will develop your complete medical

history . . . [and] will make every reasonable effort to help you get medical reports from your

own medical sources when you give us permission to request the reports."  20 C.F.R.

§ 404.1512(d); *see also* 20 C.F.R. § 416.912(d).  Failure to develop the record may be a ground

for remand.  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  Additionally, if the information

obtained from the medical sources is insufficient to make a disability determination or the

Commissioner is unable to seek clarification from treating sources, the regulations provide that

the Commissioner should ask the claimant to attend one or more consultative evaluations.  20

C.F.R. §§ 404.1512(f), 416.912(f).

II.     **THE ALJ'S DECISION**

A.      **The ALJ's Application of the Five-Step Procedure**

In this case, the ALJ, after proceeding through each of the steps listed above, determined

that Plaintiff was not disabled.  First, the ALJ found, and it is undisputed, that Plaintiff had not

engaged in substantial gainful work activity since the alleged onset date of his claimed disability,

September 4, 2007.  (R. at 13.)  Second, while the ALJ found that Plaintiff's mental retardation

was "mild" and "nonsevere," the ALJ concluded that Plaintiff's multiple osteochondromatosis,

combined with his mild mental retardation, as well as his asthma, created a "severe impairment."

17

(*Id.*)[6]   Third, the ALJ found that, despite Plaintiff's medically determinable mental impairment, Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 14.)   As this meant that Plaintiff was not presumed to be disabled, the ALJ was required to continue to the fourth and fifth steps of the analysis.   At the fourth step, the ALJ determined that Plaintiff did not have any past relevant work.  (*Id.* at 20.)   Fifth, with the burden shifted to the Commissioner to demonstrate that Plaintiff retained the residual functional capacity to perform substantial gainful work existing in the national economy, the ALJ found that Plaintiff had the functional capacity to perform the full range of sedentary work under 20 C.F.R. § 404.967(a).  (*Id.* at 14-20.)

Plaintiff now argues that the ALJ erred at step three, or alternatively, at step five.   At step three, Plaintiff argues that the ALJ did not properly assess the evidence concerning Plaintiff's deficits in adaptive functioning and altogether failed to evaluate whether Plaintiff met the requirements for the listed impairment of mental retardation, as set out in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).   Plaintiff contends that the evidence of record shows that he met the listing of Section 12.05(C), and thus should have been presumed disabled.  (Pl. Mem., at 12-14; Pl. Reply Mem., at 1-5.)   Plaintiff further argues that, even if he did not meet the impairment listing, the ALJ also erred at the fifth step of his analysis because the evidence in the record was insufficient to justify a finding that Plaintiff was actually capable of performing sedentary work.  (Pl. Mem., at 15-21; Pl. Reply Mem., at 6-9, 11-13.)   For the reasons discussed below, this Court finds that the ALJ's conclusion at step three was supported by substantial

---

[6] The second heading under the ALJ's "Findings of Fact and Conclusions of Law" specifically states that "[t]he claimant has the following severe impairment:  The claimant has multiple osteochondromatosis and mild mental retardation.  Asthma (20 CFR 416.921 *et seq.*)." (*Id.*)

evidence, and that the evidence in the record further supports the ALJ's finding that Plaintiff was capable of performing sedentary work.

### B.   Review of the ALJ's Decision

Given that the ALJ followed the five-step procedure set forth in the Social Security regulations, this Court's review is limited to determining whether, in the course of following that procedure, the ALJ correctly applied the relevant legal principles, and whether his decision was supported by substantial evidence.

### 1.   Substantial Evidence Supports the ALJ's Decision at Step Three.

As noted above, the third step in the disability assessment requires an ALJ to determine whether a claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If, at this step, the ALJ finds that the claimant meets the listing requirement, he is presumed disabled.  (*See id.*)

Plaintiff claims that, in this case, the ALJ failed to consider whether Plaintiff's impairment met or equaled the listed impairment of "mental retardation," as set forth in Section 12.05 of the regulatory listings.  Section 12.05 provides the diagnostic description of mental retardation, and states:

> Mental retardation:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> > A.   Mental incapacity evidenced by dependence upon others for personal needs (e.g. toileting, eating, dressing, or bathing) and inability to follow

19

directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B.  A valid verbal, performance, or full scale IQ of 59 or less;

Or

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.05.  Plaintiff specifically argues that he met the criteria of Subsection C of this listed impairment.  To establish disability under Subsection 12.05(C), Plaintiff would have had to first make a threshold showing – as would be necessary, regardless of which subsection of the listing may be implicated – that he had (a) "significantly subaverage general intellectual functioning," (b) "with deficits in adaptive functioning," (c) that manifested "before age 22."  Then, under the particular requirements of Subsection C, he would have had to

20

go on to show that he had (1) an IQ score between 60 and 70; and (2) a "physical or other mental impairment imposing an additional and significant work-related limitation of function."  *Id.*

The only Section 12.05(C) criterion that is at issue here is the requirement that Plaintiff have had "deficits in adaptive functioning," which, as noted above, is part of the threshold requirement that applies generally to all parts of Section 12.05.  The parties do not appear to dispute that Plaintiff had "significantly subaverage general intellectual functioning," and, as Plaintiff's application for benefits, as well as his hearing before the ALJ, both preceded Plaintiff's 22nd birthday, it is obvious that, to the extent Plaintiff suffered from *any* disability at that time, the disability had manifest "before age 22."  Further, there is little dispute that, based on the record, Plaintiff met the additional severity criteria of Subsection C.  First, the IQ testing in the record placed him with both sub-test and aggregate scores of between 60 and 70 (R. at 187), and, second, even the ALJ appears to have accepted that Plaintiff's bone condition resulted in an additional and significant work-related limitation (*see* R. at 14 (finding Plaintiff limited to sedentary work)[7]).

The parties do contest, though, whether the ALJ made the necessary finding as to Paintiff's "adaptive functioning," and Plaintiff essentially argues that, even if the ALJ made an adverse finding on this factual question, such a finding is not supported by substantial evidence in the record.  In support of his arguments, Plaintiff first notes that, while the ALJ's "Findings of

---

[7] The ALJ's statement, at step two of his analysis, that "[t]he claimant *has the following severe impairment*:  The claimant has multiple osteochondromatosis and mild mental retardation. Asthma" (R. at 13 (emphasis added)), also likely means that the ALJ considered the osteochondromatosis to be a "significant impairment," within the meaning of Section 12.05(C). *See Baneky v. Apfel*, 997 F. Supp. 543, 547 (S.D.N.Y. 1998) ("[T]he correct legal standard for determining whether an "additional" impairment is "significant" within the meaning of Section 12.05(C) is whether the "additional" impairment is "severe" within the meaning of 20 C.F.R. Section 404.1520(c).")

Fact and Conclusions of Law" include a statement that Plaintiff did not meet one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (R. at 14), the ALJ never specifically mentioned Section 12.05 (or Subsection 12.05(C)) in his decision, nor did he, at step three, provide an explicit analysis of the criteria of that listing (*see* R. at 14). (Pl. Mem., at 11.) As for the evidentiary record on the question of whether Plaintiff had "deficits in adaptive functioning," Plaintiff highlights the medical diagnoses of "mild mental retardation" contained in the record (*see* R. at 188, 194), as well as Plaintiff's educational records (R. at 75-117), his testimony that he lived with his grandmother, rather than with his children (R. at 27), and the records that show that, since leaving school in 2003, Plaintiff had never earned more than $300 in any year (R. at 73, 77). (Pl. Mem., at 12-13.) According to Plaintiff, these portions of the record all reveal that Plaintiff had deficits in day-to-day adaptive functioning. (*See id*.) To the extent the record evinces any conflict on the subject (as in the seeming inconsistency in Dr. Kamin's evaluation, noted *supra,* at 8-9), Plaintiff argues that this would merely show that remand would be necessary to clarify the resulting confusion. (Pl. Mem., at 15-18.)

Defendant, on the other hand, asserts that the ALJ made the necessary finding regarding Plaintiff's adaptive functioning, and argues that the ALJ's finding against Plaintiff on this issue was, in fact, supported by substantial evidence in the record and thus should not be disturbed. (Def. Mem., at 13-14.) In particular, Defendant contends that the references to Plaintiff's "adequate adaptive functioning" that appear in the medical reports of Drs. Hoffman and Kamin (*see* R. 188, 204-05) are sufficient evidence to support the denial of disability benefits (Def. Mem., at 103-14). On a more detailed level, Defendant points to several references in the

reviewing physicians' reports that attest to Plaintiff's ability to cope with common life demands. (Def. Reply Mem., at 3.)

Defendant, in this instance, has the better argument.  First, although it is true that the ALJ never refered to Section 12.05 at step three of his analysis (or elsewhere in his decision), he did refer – at step two of his analysis – to Section 12.00 of the listings, an over-arching provision that, *inter alia,* requires evaluation of the same "adaptive functioning" criterion at issue here. (*See* R. at 13 (citing 20 CFR, Part 404, Subpart P, Appendix 1).)  At step two, with reference to Section 12.00, the ALJ made an explicit finding that Plaintiff "show[ed] adequate adaptive functioning."  (*Id.*)[8]  In situations where the ALJ's analysis contains enough information to enable this Court to determine whether he made the requisite findings, his failure to invoke an applicable standard does not, in itself, require remand.  *Cf. O'Connor v. Astrue*, 2009 U.S. Dist. LEXIS 94554, at *8-10 (W.D.N.Y. Oct. 9, 2009) (where ALJ did not employ the applicable medical improvement review standard, the court analyzed the ALJ's decision in its entirety to ascertain whether he determined that the plaintiff had experienced medical improvement (citing *Lewis v. Barnhart*, 201 F. Supp. 2d 918, 932 (N.D. Ind. 2002))).  Here, although the ALJ never expressly stated whether he had considered Listing 12.05(C), his findings at step two nonetheless demonstrate the inapplicability of that listing.

As to whether the record contains substantial evidence to support the ALJ's finding that Plaintiff had adequate adaptive functioning, the Court notes that, while the Commissioner has

---

[8] In this regard, the ALJ stated that he had considered the "four broad functional areas set out in the disability regulations for evaluating mental disorders [] in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1)" (R. 13.), which include activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation.  20 CFR, Part 404, Subpart P, Appendix 1, 12.00(1)(C).

not defined the term "deficits in adaptive functioning" *see Ali v. Astrue*, No. 09 Civ. 2123 (JG),

2010 WL 889550, *5 (E.D.N.Y. Mar. 8, 2010), courts have analyzed adaptive functioning to

mean "a claimant's effectiveness in areas such as social skills, communication, and daily living

skills," *West v. Commissioner of Social Security Administration*, 240 Fed. Appx. 692, 698 (6th

Cir. 2007).  At step two, not only did the ALJ find that Plaintiff showed "adequate adaptive

functioning and socialization skills," but the ALJ specifically found that Plaintiff had no

limitation in activities of daily living.  (R. at 13.)  He stated that Plaintiff "is able to cook, do

laundry, and shop independently.  He can travel with public transportation independently.  He

reads the newspaper and cares for his personal hygiene without any assistance."  (*Id.*)  The ALJ

also found that Plaintiff had no limitations in social functioning or in concentration, persistence,

or pace.  (*Id.*)  Finally, the ALJ found that Plaintiff had experienced no episodes of

decompensation of extended duration.  (*Id.*)  These findings are supported by substantial

evidence in the record, including the reports of Drs. Kamin (R. at 200, 206) and Hoffman (R. at

187-88), and Plaintiff's own testimony at the hearing (R. at 28, 35).[9]

Finally, the Court notes that, although, on his evaluation form, Dr. Kamin checked a box

indicating that Plaintiff had "[s]ignificantly subaverage general intellectual functioning with

deficits in adaptive functioning" (R. at 194), this doctor ultimately concluded, in his own words,

that Plaintiff "can read the newspaper, can take the bus and subway independently, [is] able to do

---

[9] Defendant specifically points to the reports of Drs. Hoffman and Kamin, who each found that Plaintiff demonstrated "adequate adaptive functioning and socialization skills."  (Def. Reply Mem., at 3 (citing R. at 188, 206).)  In addition, Defendant emphasizes that "[t]he physicians who evaluated [P]laintiff properly relied on [P]laintiff's ability to: (1) take public transportation independently, (2) go to the library, (3) go grocery shopping, (4) take care of personal care activities, (5) shop for clothes, (6) do household chores, (7) handle money, and (8) get along with others."  (Pl. Reply Mem., at 3-4 (citing R. at 27-28, 35, 147-53).)

his [activities of daily living], cook, clean, shop independently[,] . . . has friends, pla[ys] video games, [and] shows adequate adaptive function and socialization skills . . ." (R. at 206).  Thus, Dr. Kamin found that Plaintiff's impairments did "not meet or equal [the] listing level."  (*Id.*) While the way in which Dr. Kamin filled out the form may have led to some minor confusion, his ultimate, detailed findings regarding Plaintiff's adaptive functioning could not be more clear. In any event, as discussed above, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  (*See supra*, at 14.)

Overall, this Court finds that the ALJ fulfilled his duty to develop the administrative record and that substantial evidence supports the ALJ's finding that Plaintiff did not have "deficits in adaptive functioning."  This, in turn, supports the ALJ's conclusion, at step three, that Plaintiff had not demonstrated that he met or equaled a listed impairment.  Accordingly, I recommend that the Court uphold the ALJ's finding at step three.

### 2.    Substantial Evidence Also Supports the ALJ's Determination, at Step Five, That Plaintiff Could Perform Sedentary Work.

Plaintiff's second argument is that, even if Plaintiff did not meet the listing requirements of 12.05(C), the ALJ nonetheless erred in concluding that Plaintiff was capable of performing sedentary work because Defendant did not meet its burden of proof on this point, at step five of the five-step analysis.  (*See* Pl. Mem., at 183.)  Under the procedure set out in the Commissioner's regulations, once it has been determined that a claimant cannot perform his or her past relevant employment, the burden shifts to the Commissioner to demonstrate that the claimant is capable of performing any other work.  *See* 20 C.F.R. § 404.1520; *see also Mimms*, 750 F.2d at 185 ("[O]nce the claimant has established a prima facie case [of disability] by proving that his impairment prevents his return to his prior employment, it then becomes

incumbent upon the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training.") (citations omitted).  In determining whether the Commissioner has met this burden of proof, the ALJ, under appropriate circumstances, may rely on the Medical-Vocational Guidelines contained in Appendix 2 of 20 C.F.R. Part 404, Subpart P, commonly referred to as the "grid."  *See Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

The grid "takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy."  *Id*.  As a general matter, the result listed in the grid is "dispositive on the issue of disability."  *Id*. (citation omitted).  If, however, a claimant's nonexertional impairments "significantly" limit the range of work permitted by a claimant's exertional limitations, then application of the grid "will not accurately determine disability status because [it] fail[s] to take into account claimant's nonexertional impairments."  *Bapp v. Bowen*, 802 F.2d 601, 605 (2nd Cir. 1986) (internal citation and quotations omitted).  "[W]here the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment[,] the application of the grid[] is inappropriate."  (*Id.* at 605-06.)  "Significantly diminish[ed]" means "the additional loss of work capacity beyond a negligible one or . . . one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  (*Id.* at 606.)  While the grid is not dispositive in cases where the claimant has nonexertional limits, it may still serve as a framework to guide the ALJ's decision.  20 C.F.R. § 404.1569a(d); *see also Paulino v.*

26

*Astrue*, 08 Civ. 02813 (CM)(AJP), 2010 U.S. Dist. LEXIS 77070, *29, 85-88 (S.D.N.Y. July 30, 2010) (using grid as framework and finding that substantial evidence supported the ALJ's finding of no disability at step five, in spite of ALJ's finding at step two that claimant had the "severe impairments [of] lumbar spine disorder, right ankle derangement, mental retardation, and depression").

When evaluating a claimant with nonexertional limitations, the ALJ must also consider whether the range of work that a claimant could perform is so "significantly diminished" as to require the introduction of vocational testimony. *Bapp*, 802 F.2d at 606.  In other words, if an ALJ determines that nonexertional limitations significantly diminish a claimant's ability to perform the full range of work suggested by the grid, then the ALJ should require the Commissioner to present either the testimony of a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with the claimant's limitations. *Bapp*, 802 F.2d at 603.  "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines."  *Id*.  Rather, "application of the grid guidelines and the necessity for expert testimony must be determined on a case by case basis."  *Id*., at 605.

Here, Plaintiff argues that the ALJ already found that Plaintiff's mild mental retardation and asthma, both nonexertional limitations, were "severe impairments."  (Pl. Reply Mem., at 11.)  Yet the ALJ's actual finding, to which Plaintiff cites, was that "[t]he claimant has the following severe impairment:  The claimant has multiple osteochondromatosis and mild mental retardation.  Asthma (20 CFR 416.921 *et seq.*)."  (R. at 13.)  Thus, the ALJ found only that Plaintiff's bone condition, *in combination* with his mild mental retardation and asthma, created a

27

severe impairment;[10] indeed, the ALJ expressly found that Plaintiff's mild mental retardation, by itself, did not cause more than "minimal limitation in [Plaintiff's] ability to perform basic mental work activities and [was] therefore *nonsevere*."  (R. at 13 (emphasis added).)  As for Plaintiff's asthma, the ALJ noted that Plaintiff smoked up to a pack of cigarettes a day and smoked marijuana at least three times a week and, at times, every day (R. at 17, 18) – evidence that suggested that Plaintiff's asthma was also not severe.  In the end, the ALJ apparently accepted Dr. Akresh's conclusion that there were "mild limitations in [Plaintiff's] ability to be exposed to allergens secondary to his asthma."  (R. at 18.)  Overall, the ALJ's decision shows that he determined that Plaintiff's nonexertional limitations were only "mild" or "minimal," and, as described above (*see supra* at 3-9), the record contains substantial evidence to support this determination.

As the Court has no basis to set aside the ALJ's supported findings that Plaintiff's nonexertional limitations were "minor" or "minimal," there is also no basis for the Court to conclude that these limitations "significantly diminished" Plaintiff's ability to perform the full range of work suggested by the grid.  *See Bapp*, 802 F.2d at 606.  Given the ALJ's findings that Plaintiff's mild mental retardation did not "cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities" (R. at 13), and that Plaintiff's asthma created only "mild limitations" (R. at 18), it was appropriate for the ALJ to rely on the grids.  Further, for the same reason, testimony from a vocational expert was not necessary.  In accordance with the grid, substantial evidence supports a finding of "no disability" at step five.

---

[10] *See* the ALJ's statements of the "Applicable Law":  "At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" *or a combination of impairments that is "severe."*  (R. at 12 (emphasis added).)

## CONCLUSION

For the forgoing reasons, I respectfully recommend granting Defendant's motion for judgment on the pleadings (Dkt. 10) and denying Plaintiff's cross-motion (Dkt. 12).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Barbara S. Jones, United States Courthouse, 500 Pearl Street, Room 1920, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, NY 10007. Any requests for an extension of time for filing objections should be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      November 8, 2011

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Barbara S. Jones, U.S.D.J.

Steven Banks, Esq.
The Legal Aid Society
Bronx Neighborhood Office
953 Southern Boulevard
Bronx, New York 10459

Susan D. Baird, Esq.
Assistant U.S. Attorney
One St. Andrew's Plaza
New York, New York  10007